In the United States District Court
For the Middle District of Pennsylvania
Williamsport Division

| | |
|---|---|
| LaMarr Pirkle, Theodore Dannerth, Lauren Danks, and Casey Flynn,<br><br>*Plaintiffs,*<br><br>*v.*<br><br>Governor Thomas W. Wolf, in his official capacity, Kathryn Boockvar, secretary of the Commonwealth of Pennsylvania, in her official capacity,<br><br>*Defendants* | Case No.: **4:20-cv-02088-MWB**<br><br>**Memorandum in Support of Motion for Declaratory and Permanent Injunctive Relief** |

# Memorandum in Support of
# Motion for Declaratory and Permanent Injunctive Relief

The evidence of illegal voting in key counties demonstrates that Plaintiffs ("Voters") have suffered the personal harm of vote dilution. If Defendants include presidential-election results from those key counties in certifying Presidential Electors for this Commonwealth, Voters will irreparably suffer the disenfranchisement caused by vote dilution as illegal votes are sealed into the results and Presidential Electors are chosen on the basis of illegal voting sufficient to change or cast doubt on the outcome of the election in key counties. Sufficient evidence exists—provided in expert-report form at the evidentiary hearing—in these key counties of "an irregularity or illegality sufficient to change or place in doubt the result,'" 26 Am.

1

Jur. 2d Elections § 389 (quoting *Gore v. Harris*, 772 So.2d 1234 (Fla. 2000), *rev'd on other grounds*, *Bush v. Gore*, 531 U.S. 98 (2000)), which is the general standard for invalidating elections. Given the unique nature of Electoral College procedures, there is insufficient time for the remedy of another election, so Voters' Motion seeks the following relief:

> 1. Declare that the inclusion of illegal votes in identified counties violates Voters' right to vote under the First and Fourteenth Amendment by vote-dilution disenfranchisement.
> 2. Declare that the proper remedy for this constitutional violation as applied to presidential-election results is to exclude presidential-election results from those counties for the Presidential Elector certification under 3 U.S.C. § 6 for this state.
> 3. Under that remedy, declare that there is sufficient evidence that illegal votes were counted in the identified county or counties to change or place in doubt the results of the November 3, 2020 presidential election results in contested counties, so that the county's presidential-election results must be invalidated.
> 4. Enjoin Defendants from preparing and conducting the certification activities for Presidential Electors described in 3 U.S.C. § 6 (and applicable state law implementing the federal provision) without excluding the presidential-election results from the identified counties.

ECF No. 1 at 18. (3 U.S.C. § 6 is recited in the Motion.)

## Applicable Tests

"Whether declaratory relief should be granted in an appropriate case is committed to the sound discretion of the trial court." *Main Line Paving Co. v. Bd. of Educ.*, 725 F. Supp. 1349, 1357 (E.D. Pa. 1989) (citing *Bituminous Coal Operators' Ass'n v. Int'l Union UMW*, 585 F.2d 586, 595-96 (3d Cir. 1978)). "In deter-

mining the appropriateness of declaratory relief, the district court may consider

several factors, including whether a declaratory judgment will resolve an uncer-

tainty giving rise to a controversy, the convenience of the parties, the public inter-

est, and the availability of other remedies." *Nolu Plastics v. Valu Eng'g*, No.

04-5149, 2005 U.S. Dist. LEXIS 4530, at \*12 (E.D. Pa. Mar. 21, 2005) (citing *see*

*Terra Nova Ins. Co. v. 900 Bar*, 887 F.2d 1213, 1224 (3d Cir. 1989)).

    Regarding permanent injunctions, courts require movants to meet their burden

of proof, *Ciba-Geigy Corp. v. Bolar Pharmaceutical Co.*, 747 F.2d 844, 850 (3d

Cir.1984), as to this test:

> (1) the moving party has shown actual success on the merits;
> (2) the moving party will be irreparably injured by the denial of injunctive relief;
> (3) the granting of the permanent injunction will not result in even greater harm to the defendant; and
> (4) the injunction would be in the public interest.

*City of Phila. v. Sessions*, 309 F. Supp. 3d 289, 338 (E.D. Pa. 2018) (quoting

*Coffelt v. Fawkes*, 765 F.3d 197, 201 (3d Cir. 2014)).

# Facts

### *Parties and Timeframe*

    Plaintiffs are eligible registered voters in this state and were qualified to, and

did, vote for a presidential candidate in the November 3, 2020 presidential election

in this state. They are not residents of key counties identified below for which

presidential-election results should be excluded from the presidential-election re-sults used by Defendants to certify Presidential electors for this state. ECF No. 1 at ¶¶ 6-10 (the Complaint is verified as to this evidence).

Defendants are authorized by federal and state law to engage the process of certifying Presidential Electors under 3 U.S.C. § 6. ECF No. 1 at ¶¶ 11-13.

The state certification of Presidential Electors prescribed in 3 U.S.C. § 6, will occur this year by December 8, and the Electoral College votes on December 14. Accordingly, Defendants must certify the results of the election of Presidential Electors by December 8, though § 6 provides for certification or recertification of results after litigation such as this.

***Presidential-Election Results in Key Counties***

As of November 10, 2020, the following results were reported for presidential-election results at the sites linked below, though these numbers are constantly changing as updates continue.[1] **Statewide**, 3,362,873 ballots cast for Joe Biden and 3,317,943 ballots cast for Donald Trump, a difference of 44,930 ballots.[2] In **Phila-delphia County**, 570,708 ballots were cast for Joe Biden and 127,813 ballots were

---

[1] All links herein were checked on November 11, 2020, but results cited here and elsewhere are as of November 10 and remain in flux.

[2] *See* https://www.electionreturns.pa.gov/General/SummaryResults.

cast for Donald Trump, a difference of 442,895 ballots.[3]  In **Montgomery County**, 313,543 ballots were cast for Joe Biden and 182,907 ballots were cast for Donald Trump, a difference of 130,636 ballots.[4] In **Delaware County**, 200,911 ballots were cast for Joe Biden and 116,216 ballots were cast for Donald Trump, a difference of 84,695 ballots.[5] And in **Allegheny County**, 415,861 ballots were cast for Joe Biden and 274,348 ballots were cast for Donald Trump, a difference of 141,5-13 ballots.[6]  These are the key counties for which presidential-election results should be excluded in certifying Presidential Electors from this state.

***Sufficient Evidence Places Doubt on Key-County Presidential-Election Results.***

Sufficient evidence exists to place in doubt the November 3 presidential-election results in identified key counties in two forms: (1) evidence of specific illegal actions and (2) analytical evidence from available data demonstrating illegal activi-

---

[3] *See* https://www.electionreturns.pa.gov/General/CountyResults?countyName=Philadelphia&ElectionID=83&Election Type=G&IsActive=1.

[4] *See* https://www.electionreturns.pa.gov/General/CountyResults?countyName=Montgomery&ElectionID=83&ElectionType=G&IsActive=1.

[5] *See* https://www.electionreturns.pa.gov/General/CountyResults?countyName=Delaware&ElectionID=83&ElectionType=G&IsActive=1.

[6] *See* https://www.electionreturns.pa.gov/General/CountyResults?countyName=ALLEGHENY&ElectionID=83&ElectionType=G&IsActive=1.

5

ties. Some evidence of the first follows. But Voters have moved to consolidate this case with the one brought by the Trump Campaign, *see* Ex. 1 (Trump campaign complaint), and rely primarily on the Trump Campaign to establish the first sort of evidence, some of which is described next.[7]

In **Philadelphia County**, some voters were advised they needed to cure ballot defects while others were not. (Ex. 1, at ¶¶ 133-34, 136.) Poll watchers were excluded from access to canvassing locations. (*Id*. at ¶¶ 142, 145.).

In **Montgomery County**, a poll watcher overheard unregistered voters being advised to return later to vote under a different name that was registered in the poll book. (*Id*. at ¶ 117.) As of November 10, voter turnout was 88.5%, 19% higher than statewide turnout of 69.3%. 2020 Voter Registration Statistics – Official, Department of State,

https://www.dos.pa.gov/VotingElections/OtherServicesEvents/VotingElectionStatistics/Documents/2020%20Primary%20VR%20Stats%20%20FINAL.pdf (showing 574,403 registered voters in Montgomery County); Unofficial Election Results, Montgomery County, Pennsylvania,

https://electionresults-montcopa.hub.arcgis.com/ (showing 508,442 ballots

---

[7] Voters' unique evidentiary contribution—to be submitted in the form of one or more expert reports submitted at the evidentiary hearing—will then be described.

received in Montgomery County); Schaul et al., *2020 turnout is on pace to break century-old records*, The Washington Post,

https://www.washingtonpost.com/graphics/2020/elections/voter-turnout/ (showing a 69.4% voter turnout statewide).

In **Delaware County**, voters that were recorded to have received mail-in ballots were given regular ballots and not required to sign the registration book. (Ex. 1 at ¶ 125.) Poll watchers were granted extremely restricted access to a back room counting area. (*Id*. at ¶ 143.) And ballots received on Election Day were not separated from ballots received after 8 p.m. that day. (*Id*. at ¶ 151.) Voter turnout was 75.87%, compared to statewide turnout of 69.3%. General Election Unofficial Results, Delaware County, Pennsylvania,

https://election.co.delaware.pa.us/eb/November_2020/index.html.

In **Allegheny County**, voters were required to vote provisionally because the records indicated they had requested to vote by mail when they had not. (Ex. 1 at ¶ 116.) Poll workers were reported to be close enough to voters so as to observe the actual vote. (*Id*. at ¶ 120.) Voter turnout was 74.54%, compared to statewide turnout of 69.3%. Unofficial Results, Allegheny County, PA,

https://results.enr.clarityelections.com/PA/Allegheny/106267/web.264614/#/summary.

Throughout the state, voters received mail-in ballots without applying for them, in some cases receiving more than one. (Ex. 1 at ¶ 111.)

Throughout the state, in-person voters were advised they must vote provisionally because they had asked for and received a mail-in ballot, when no such request was made. (*Id*. at ¶ 112.) In some cases, they were outright denied the right to vote. (*Id*. at ¶ 113.)

It is estimated that over 680,000 ballots were processed without observation in Allegheny and Philadelphia counties. (*Id*. at ¶ 148.)

This and other evidence detailed in the Trump Complaint, (*id*. at ¶¶ 51-61, 107-152), suffices to place in doubt the November 3 presidential-election results in identified key counties and/or the state as a whole.

### *Voters Intend to Provide Broad Analytical Evidence of Harm from Data*

In addition to the foregoing evidence, Voters are currently compiling analytical evidence of illegal voting from data they already have and are in the process of obtaining, some of which must come through expedited discovery (such as the final data on who actually voted). They intend to produce this evidence at the evidentiary hearing to establish that sufficient illegal ballots were included in the results to change or place in doubt the November 3 presidential-election results. This will be in the form of one or more expert reports based on data analysis comparing state

mail-in/absentee, provisional, and poll-book records with state voter-registration databases,[8] U.S. Postal Service records, Social Security records, criminal-justice records, department-of-motor-vehicle records, and other governmental and commercial sources by using sophisticated and groundbreaking programs to determine the extent of illegal voters and illegal votes, including double votes, votes by ineligible voters, votes by phantom (fictitious) voters, felon votes (where illegal), non-citizen votes, illegal ballot harvesting, and pattern recognition to identify broader underlying subversion of the election results. Plaintiffs have persons with such expertise and data-analysis software already in place who have begun preliminary analysis of available data to which final data, such as the official poll list, will be added and reports generated.

Based on preliminary information and belief, the expert report will identify persons who cast votes illegally by casting multiple ballots, were deceased, had moved, or were otherwise not qualified to vote in the November 3 presidential election, along with evidence of illegal ballot stuffing, ballot harvesting, and other illegal voting. This evidence will be shortly forthcoming when the relevant official documents are final and available, for which discovery may be required, and the result of the analysis and expert report(s) based thereon is expected to show that

---

[8] This includes lists of voters using a Federal Postcard Application to register vote, and any reports documenting voters contacted to cure rejected ballots.

sufficient illegal ballots were included in the results to change or place in doubt the November 3 presidential-election results in the key counties.

# Argument

Voters (**I**) establish actual success on the merits, (**II**) the other permanent-injunction factors, and (**III**) the declaratory-judgment test.

# I.
## Voters Establish Actual Success on the Merits.

Voters establish actual success on the merits because (**A**) they have standing, (**B**) certifying Presidential Electors without excluding presidential-election results from key counties would violate voters' fundamental right to vote by vote-dilution disenfranchisement, and (**C**) excluding such results is an appropriate remedy.

## A.  Voters Have Standing for Their Vote-Dilution Disenfranchisement Claim.

As recognized in *Donald J. Trump for President v. Bullock*, 2020 WL 5810556 (D. Mont. Sept. 30, 2020), individual voters have standing to bring a vote-dilution disenfranchisement claim, *id.* at *7 & n.4. "[T]he Supreme Court has repeatedly enumerated the principle that claims alleging a violation of the right to vote can constitute an injury in fact despite the widespread reach of the conduct at issue." *Id.* at 7. *See also Orloski v. Davis*, 564 F. Supp. 526, 530 (W.D. Pa. 1983) (voter standing to challenge right-to-vote burden); *Pierce v. Allegheny County Bd. of*

10

*Elections*, 324 F. Supp. 2d 684, 693-93 (W.D. Pa. 2003) (voter standing to challenge right-to-vote burden).

Voters meet the standing requirements of (1) injury in fact, (2) traceability, and (3) redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

First, regarding "injury in fact," *id.* at 560, protection for individual voting rights have been increasingly recognized for decades. *See, e.g.*, *Baker v. Carr*, 369 U.S. 186, (1962); *Gray v. Sanders*, 372 U.S. 186 (1963); *Reynolds v. Sims*, 377 U.S. 533 (1964); *Moore v. Ogilvie*, 394 U.S. 814 (1969). The fundamental right to vote is well-established: "[T]he Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections" and to have that vote counted. *Reynolds*, 377 U.S. at 554. "[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Id.* at 555. "The right to vote can neither be denied outright, nor destroyed by alteration of ballots, nor diluted by ballot-box stuffing." *Id.* (internal citations omitted). Voters already suffer personal vote-dilution harm by inclusion of illegal votes in identified key counties. Voters seek to stop the further vote-dilution disenfranchisement of having Presidential Electors in this state certified on the basis of presidential-election results in counties where sufficient illegal ballots were included in the results to

11

change or place in doubt the results of the November 3, 2020 presidential election in this state. Those are constitutionally recognized, particularized harms.

Second, regarding "traceability," *Lujan.* 504 U.S. at 560, Defendants are responsible for the Presidential Elector certification proceedings in 3 U.S.C. § 6, so the vote-dilution disenfranchisement resulting from such certifying that includes presidential-election results from identified counties is fairly traceable to them.

Third, regarding "redressability," *id.* at 561, this vote-dilution disenfranchisement of Voters will be redressed by excluding from the presidential-election results on which Presidential Electors are certified those results from counties where sufficient illegal ballots were included in the results to change or place in doubt the results of the November 3 presidential election in this state.

Voters' claim of vote-dilution disenfranchisement is not a generalized grievance under *Lujan*'s two formulations of that doctrine:

> [1] a plaintiff raising only a generally available grievance about government—claiming only harm to his and *every citizens*'s interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy,

*id.* at 560-61 (emphasis added), and

> [2] an injury amounting only to the alleged violation of a right to have the Government act in accordance with law [is] not judicially cognizable ... [and] cannot alone satisfy the requirements of Art. III . . . ,"

12

*id.* at 575-76 (internal quotation marks and citation omitted). So there are two issues: (1) whether the claimant is just a *citizen* trying only to make the government do its job without more and (2) whether the claim the same claim held by "every citizen." Because the first issue is more specific, it is the core of the analysis. "[T]he proper inquiry is whether the plaintiffs sue solely as *citizens* who insist that the government follows the law." *Andrade v. NAACP of Austin*, 345 S.W.3d 1, 8 (Tex. 2011) (citing E. Chemerinsky, *Constitutional Law: Principles and Policies* 91 (3d ed. 2006)) (emphasis added). "[N]either *citizens* nor taxpayers can appear before a court simply to insist that the government and its officials adhere to the requirements of law." C.A. Wright et al., *Federal Practice & Procedure* § 3531.10 (3d ed. 2008) (emphasis added). Thus, mere "citizen" standing is the issue, and the present challenge is not a generalized grievance under the first or second question.

First, Voters don't bring their claims under mere "citizen" standing. Rather, they assert personal harm from the violation of their own fundamental right to vote, protected by the First and Fourteenth Amendments. Voters' claim is particularized: They don't challenge anything not directly bearing on their claim, so they are not just trying to make the government do its job in some general way but rather challenge that which particularly violates their rights.

Second, Voters assert a harm that is not the same as for every "citizen." "The bar is based not on the number of people affected—a grievance is not generalized merely because it is suffered by large numbers of people." *Andrade*, 345 S.W.3d at 7 (citing Chemerinsky, *Constitutional Law* 91). "[D]enying standing to persons who are in fact injured simply because many others are also injured, would mean that the most injurious and widespread Government actions could be questioned by nobody." *United States v. SCRAP*, 412 U.S. 660, 686-68 (1973). "[W]here a harm is concrete, though widely shared, the Court has found injury in fact." *FEC v. Akins*, 524 U.S. 11, 24 (1998). Voters' claim is four levels more specific than "every citizen['s]": (1) within "citizens" are those eligible to register as voters—only they have the potential to become registered voters; (2), within eligible voters are registered voters—only they have a right to vote; (3) within eligible, registered voters are those who actually voted—only they have a vote subject to vote-dilution disenfranchisement; and (4) within these eligible, registered, voters who actually voted are those in a jurisdiction where there are counties with evidence that sufficient illegal ballots were included in the results to change or place in doubt the results of the November 3 presidential election. These Voters don't assert a generalized grievance.

14

So a court that fails to recognize voter standing for vote-dilution-disenfranchisement claims because they "are materially grounded on ostensible election fraud that may be conceivably raised *by any [state] voter*," *Paher v. Cegavske*, No. 3:20-cv-00243-MMD-WGC, 2020 WL 2748301, at *4 (D. Nev. May 27, 2020) (emphasis in original), errs because *Lujan* based generality on *citizens*, not the more specific *voter*, and no *unqualified* voter could have a vote harm—the very issue here with illegal ballots. *Paher* noted that voters "argue[ed] that they did not merely assert 'citizen' standing, and that harm is specific to them as registered, eligible voters, who actually vote," *id.*, but instead of refuting that argument switched to the "even if" response that their claim of likely vote fraud from mail-in ballots was speculative, *id.* Here, the voting is done, and the evidence is based on what happened, not what was likely to happen, so no speculation is at issue.[9]

Two other reasons support voter standing. First, an election is the key opportunity for "We the People," U.S. Const. pmbl., to exercise their constitutional sovereignty in this democratic Republic, so elections are precisely about voters exercising their voting right, no one else is as directly affected as voters so disenfranchised, they must be able to challenge disenfranchisement. Second, political parties are routinely permitted to assert the voting rights of their members in a representa-

---

[9] Voters distinguished two inapplicable cases in ECF No. 12 at 7 n.1, incorporated here by reference.

tional capacity, but that depends *solely* on the fact that those voting members have

standing. *See, e.g.*, *Summers v. Earth Island Institute*, 555 U.S. 488, 498-99 (2009)

(for representational standing, organization must "make specific allegations estab-

lishing that at least one identified member had suffered or would suffer harm" or

that "*all* the members of the organization are affected by the challenged activity");

*cf. Georgia Republican Party v. SEC*, 886 F.3d 1198, 1203-05 (11th Cir. 2018)

(rejecting political party standing for not establishing that a member had standing).

Voters necessarily have standing to challenge harms to their voting rights.

## B. Certifying Presidential Electors Without Excluding Key Counties Would Violate Voters' Fundamental Right to Vote by Vote-Dilution Disenfranchisement.

Certifying Presidential Electors without excluding presidential-election results

from key counties would violate Voters' fundamental right to vote by vote-dilution

disenfranchisement. The key counties identified are those where sufficient illegal

ballots were included in results to change or place in doubt the November 3 presi-

dential-election results. Furthermore, once discovery provides the final data set of

who actually voted, Voters intend to provide the Court with one or more expert

reports that will establish this definitively at the evidentiary hearing in this matter.

The right to vote, with the included right to have one's vote counted, is pro-

tected by the First and Fourteenth Amendments and is fundamental, *Harper v. Va.*

16

*State Bd. of Elections*, 383 U.S. 663, 667 (1966), and well-established: "Undeniably the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections" and to have that vote counted, *Reynolds v. Sims*, 377 U.S. 533, 554 (1964).

"The right to vote can neither be denied outright, nor destroyed by alteration of ballots, nor diluted by ballot-box stuffing." *Id.* at 555 (internal citations omitted). "And the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Id.* Illegal votes are a form of "ballot-box stuffing," disenfranchising legal voters by diluting their votes.

So if Defendants certify presidential-election results from counties where sufficient illegal ballots were included in the results to change or place in doubt the November 3 presidential-election result, Voters' valid, legal votes will be unconstitutionally diluted by illegal votes.

**C. Excluding Presidential-Election Results from Key Counties When Certifying Presidential Electors Is an Appropriate Remedy.**

As established in the Facts discussion, existing and forthcoming evidence establish that in identified key counties illegal voting has occurred in connection with the presidential-election results, which establishes that Voters' votes have been unconstitutionally diluted. So the presidential-election elections in those counties

should be invalidated and not included in the certification of votes for selecting Presidential Electors.

The relevant standard for invalidating election results from a particular jurisdiction generally is that "'the party contesting the election demonstrates an irregularity or illegality sufficient to change or place in doubt the result.'" 26 Am. Jur. 2d Elections § 389 (quoting *Gore v. Harris*, 772 So.2d 1234 (Fla. 2000), *rev'd on other grounds*, *Bush v. Gore*, 531 U.S. 98 (2000)). "Ordinarily, an election may be contested only for matters that would impeach the fairness of the result." *Id.* (citing *Duncan v. McMurray*, 249 S.W.2d 156 (Ky. 1952); *Appeal of Soucy*, 649 A.2d 60 (N.H. 1994); *Fielding v. South Carolina Election Com'n*, 408 S.E.2d 232 (S.C. 1991). "An election will not be invalidated unless the party contesting the election demonstrates an irregularity or illegality sufficient to change or place in doubt the result." *Id.* (citing *Middleton v. Smith*, 539 S.E.2d 163 (Ga. 2000)).

In *Harris*, the Florida statute included as grounds for contesting an election "'Receipt of a number of illegal votes or rejection of a number of legal votes sufficient to change or place in doubt the result of the election.'" 772 So.2d at 1250 (citation and emphasis omitted). *Harris* summarized the standard thus: "It is not enough to show a reasonable possibility that election results could have been al-

18

tered by such irregularities, or inaccuracies, rather, a reasonable probability that the results of the election would have been changed must be shown." *Id.* at 1255.

This generally recognized standard is reflected in this State's laws. In *In re Ctr. Twp. Democratic Party Supervisor Primary Election*, 4 Pa. D. & C.4th 555  (Pa. Com. Pl. 1989), a county trial court, applying 25 P.S. 3464, held that when "the electoral process has been undermined by fraudulent and perhaps criminal conduct, [the court's] duty to act is overwhelming, particularly where, as here, the fraud may have altered the outcome of the election," *id.* at 560-61, and invalidated a township election based on evidence of 15 fraudulently cast absentee ballots.  In *Bright's Contested Election,* 292 Pa. 389 (1928), the Pennsylvania Supreme Court affirmed the order of a trial court which, finding massive fraud, intimidation, and illegal voting had occurred at one polling place, concluded that it could not determine which of the votes cast at that polling place were lawful and which were not, and threw out the entire ballot count. *Id.*  The Supreme Court affirmed its authority "to throw out the entire poll of a district upon a proper showing." *Id.* at 394. *See also In re Ctr. Twp. Democratic Party Supervisor Primary Election*, 4 Pa. D. & C.4th at 560 ("The Supreme Court specifically held that when it is not possible to separate the lawful ballots from the unlawful or fraudulent ballots, then the entire vote must be rejected and thrown out); *Gollmar's Election, Case of*, 316 Pa. 560,

567, 175 A. 510, 513 (1934) ("There is no doubt that where such glaring fraud and illegality exists as to make it impossible to purge the ballot boxes with any degree of accuracy, the court may reject the whole vote of any or of several districts.").

Regarding evidence for invalidating election results in a jurisdiction, *Harris* established that the required showing could be made (inter alia) by "credible statistical evidence" establishing a changed election outcome "by a preponderance of a reasonable probability," 772 So.2d at 1250.

In addition to *states* routinely providing for invalidating election results, including in the Presidential Electors context, the U.S. Supreme Court *itself* in *Bush*, 531 U.S. 98, required that partial recounts in some counties (that unconstitutionally employed different and unclear standards for determining voter intent) be excluded from the final count in the Florida 2000 presidential election because of the constitutional flaws identified, *id.* at 107-12.

The foregoing articulations of the standard for invalidating election results in a particular jurisdiction—including proof of reasonable probability by credible statistical evidence—should be applied here to determine whether the election results in certain counties should be excluded for purposes of certifying Presidential Electors. In some situations where election results are invalidated, a new election is ordered. *See, e.g.*, *Pabey v. Pastrick*, 816 N.E.2d 1138 (Ind. 2004). But with the Elec-

toral College scheduled to be certified by December 8 and to meet and vote on December 14, 2020, there is insufficient time for a new election in the counties involved. Moreover, the Electoral College is unique and statutory provisions provide special procedures for moving the Electoral College vote along expeditiously since the presidency is at issue. So the proper remedy here is to exclude the results from jurisdictions meeting the standard for disqualifying elections from the final results that are certified and reported for Presidential Electors.

Because illegal votes dilute legal votes, the evidence establishes, and will establish, that the rights of Voters have been violated by vote-dilution disenfranchisement from the presidential-election results in the key counties. And Voters will be further irreparably harmed if Defendants certify Presidential Electors including such results from those key counties. Consequently, the presidential-election results from the counties identified should not be included in certified and reported totals for Presidential Electors from this state.

In sum, Voters establish actual success on the merits.

## II.
### Voters Meet the Other Three Permanent-Injunction Factors.

Voters also meet the other factors involving (**A**) irreparable harm, (**B**) no greater harm to Defendants, and (**C**) the public interest.

21

**A. Voters will have irreparable harm absent the permanent injunction.**

Voters' right to vote has already been diluted by illegal votes, a cognizable harm to their fundamental right to vote protected by the First and Fourteenth Amendments to the U.S. Constitution. Voters have already suffered the cognizable harm of vote-dilution disenfranchisement. Voters seek to repair that harm to the extent that the evidence in any key county establishes an irregularity or illegality sufficient to change or place in doubt the result of the presidential-election results. Where there is such a showing, certifying Presidential electors from this state on the basis of that county's presidential-election results would cause Voters irreparable harm because that vote-dilution disenfranchisement would become locked into irreversible selection of Presidential Electors for this state based on those illegal ballots.

**B. Defendants will suffer no greater harm from a permanent injunction.**

While Voters will suffer constitutional harm absent requested relief, Defendants would only be doing their constitutional duty to protect Voters' fundamental right to vote while engaging in their duty under 3 U.S.C. § 6 to certify Presidential Electors. In fact, § 6 expressly provides for certification *after* a "final determination" resulting from litigation. Defendants are sued only in their official capacities under 3 U.S.C. § 6, so their only interest is to accurately certify accurate presiden-

22

tial-election results. They have no other cognizable interest under 3 U.S.C. § 6. No personal or state interest comes into play. So they will suffer *no* harm from an order of this Court providing the proper remedy requested.

## C.  An injunction would be in the public interest.

An injunction is in the public interest. The public's proper interest is like Defendants' in this context, i.e., no partisan or other interest is cognizable, only protecting the right to vote, the integrity of elections, assuring fair and accurate results in our election, and certifying Presidential Electors based on those bedrock principles of our democratic Republic.

## III.
## Voters Meet the Declaratory-Judgment Factors.

Voters also meet the declaratory-judgment factors. *See supra* Applicable Tests. Requested declarations will resolve uncertainty in this controversy. Any considerations of party convenience must yield to constitutional duty and mandates. The public interest favors relief for reasons just shown. Voters have no other remedy for the violation of their constitutional rights. And they have established actual success on the merits, requiring that they be given the relief the First and Fourteenth Amendments, and 42 U.S.C. § 1983, require.

# Conclusion

Voters' motion for declaratory judgment and a permanent injunction should be granted.

Date: November 12, 2020                    Respectfully Submitted,

/s/ Anita Y. Milanovich
Anita Y. Milanovich (MT #12176)*
  *Of Counsel*
aymilanovich@milanovichlaw.com
MILANOVICH LAW, PLLC
100 E. Broadway Street
The Berkeley Room
Butte, MT 59701
Telephone: 406/589-6856

James Bopp, Jr. (IN #2838-84)*
  jboppjr@aol.com
True the Vote, Inc.
  Validate the Vote Project
THE BOPP LAW FIRM, PC1 South Sixth St.
Terre Haute, IN 47807-3510
Telephone: 812/232-2434

*Lead Counsel for Plaintiffs*
*\*pro hac vice application granted 11/12/20*

Walter S. Zimolong III, Esq.
ZIMOLONG, LLC
wally@zimolonglaw.com
P.O. Box 552
Villanova, PA 19085-0552
Tele: (215) 665-0842
*Local Counsel for Plaintiffs*

24

## **Certificate of Service**

I hereby certify that on November 12, 2020, I caused the foregoing Motion to be filed with the United States District Court for the Middle District of Pennsylvania, Williamsport Division, via the Court's CM/ECF system, which served all counsel of record.

.

/s/ Anita Y. Milanovich
Anita Y. Milanovich (MT #12176)
*Counsel for Plaintiffs*

25